IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LINDA MBIMADONG,<br><br>Defendant. | Case No. 1:21-cr-98<br><br>The Honorable T.S. Ellis, III<br><br>Hearing: January 7, 2022 |

## **POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits its position with respect to sentencing of Linda Mbimadong ("the defendant" or "Mbimadong"). The defendant comes before the Court for sentencing after pleading guilty to one count of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349. The United States has no objection to the Probation Officer's calculations of the defendant's Sentencing Guidelines range as set forth in the Presentence Investigation Report ("PSR"). *See* PSR ¶¶41-52, 80-81. For the reasons set forth herein, the United States respectfully submits that the Probation Officer has correctly calculated the advisory guidelines range, and that a substantial term of imprisonment would be reasonable and appropriate in consideration of all of the factors set forth in 18 U.S.C. § 3553(a).

### **I. BACKGROUND**

This scheme came to light after an adult child of a 78-year-old victim in Annandale, Virginia, reported that his father had suffered approximately $580,000 in losses to a romance fraud

scheme over a period of months in 2020. Special Agents of the FBI were able to trace funds the Annandale victim sent to various "money mules," persons often of Ghanaian origin living in the United States. These money mules work principally at the direction of scheme orchestrators in Ghana. The money mules have varying levels of knowledge about the scheme as a whole. In due course, additional victims were identified, including a 74-year-old woman in Colorado, who had mailed a cashier's check for $79,300 payable to Linda Mbimadong.

While the Colorado victim was mailing her check to Mbimadong, FBI special agents were in contact with Mbimadong and her co-habitant (and now co-defendant), Richard Broni. Mbimadong denied ever receiving the check from the Colorado victim and told agents they should try to intercept the check before it came to her. Shortly thereafter, agents learned Mbimadong had deceived them. Bank records showed Mbimadong had already deposited the check. Before Mbimadong could distribute the money to other co-conspirators, however, the government successfully froze the funds at the bank. Concerned that the defendants might flee to Ghana, the government obtained warrants for Mbimadong and Broni, who were arrested in New Jersey, ordered detained, and transported here, where they remain detained. Following indictment, both entered guilty pleas (Mbimadong to the Indictment and Broni to a Criminal Information).

The scheme (and the defendants' roles in it) is heavily detailed in the Statements of Facts of their respective pleas, in the Indictment and Criminal Information, and in their respective PSRs. In short, elderly, and lonely persons like the Annandale and Colorado victims, as well as many others, were targeted from Ghana via social media applications geared toward finding romance or friendship online. Hiding behind computers, Ghanaians posed as American or British diplomats or military personnel nearing retirement (to the Colorado victim), or recently widowed heiresses (to

the Annandale victim), all of whom were overseas. Woven into the romance and friendship scenarios was an element of financial reward: each fictious person supposedly had inherited (or obtained through life savings or some other story) a large cache of gold bullion and/or precious stones.

After patiently cultivating the victims' trust and making myriad promises of starting new lives based on this expected wealth, the Ghanaians communicating with the victims would inject a crisis scenario at the appropriate psychological time — the arrest of the heiress, or the impoundment of gold bullion. Each crisis could only be resolved by the victim wiring money, mailing checks, or mailing new iPhones or Apple MacBooks to third parties.

As the financial exploitation stage of the scheme unfolded, new characters were invented and introduced, such as lawyers and financial advisors, who also communicated with the victims to lend the scheme an air of verisimilitude. Victims were repeatedly hit with demands for money, and dire consequences to the fictious romantic objects of desire (and/or the loss of gold bullion) were threatened unless victims continued to drain all their life savings, home equity, and retirement accounts.

This part of the scheme is perhaps the most exploitative and deplorable. The so-called "financial advisors" and "lawyers" that the Ghanaians invented and personified communicated extensively with victims, directing victims to ship packages of valuable items and share all their bank account information, credit card information, retirement accounts, and home equity details. Basically, anything that could be monetized and exploited was demanded. The scheme orchestrators would then figure out how to maximize the financial exploitation of particular victims over time, maxing out credit cards at one point; draining IRAs at another; then turning to

any remaining assets. As a result, victims have been left bankrupted, massively in debt, and at risk of losing their homes. Sometimes after their funds were depleted, the scammers then stole the victims' identities and victimized them in yet new and creative ways: fraudulently obtaining additional credit cards that were promptly maxed out or using a victim's identity and photos to pose as a love interest on other social media platforms to lure in new victims. One victim was even conned into taking out a $250,000 Paycheck Protection Program loan and giving the funds to the love interest overseas, after having drained her own funds. That love interest texted the victim "cya lata" at the end of the scam.

      The two defendants being sentenced in this Court did not play the role of the love interests or make direct misrepresentations to the victims via social media. That was done from Ghana. Our defendants knew or had reason to know it was happening, however, and willingly played a role in the scam, including receiving funds directly from the Annandale and Colorado victims – individuals who the defendants had never met, suddenly sending them tens of thousands of dollars. Indeed, both defendants played somewhat similar roles, operating as "money mules," with Mbimadong having greater involvement in terms of time, volume of criminal activity in the conspiracy, and directing the actions of other money mules.

      A money mule is essentially a money launderer. In this case, victim funds are laundered to Ghana via several routes. Sometimes, cash is distributed up the chain. Other times, trade-based money laundering is the means. For instance, victim funds are used to purchase high-end electronics, or vehicles, then shipped to Ghana or (in the case of small items) carried in suitcases on planes, where they are sold by co-conspirators on the other end – all proceeds being essentially profits of the scheme. Multiple shell entities, bank accounts, small shipping companies, and small

independent car dealerships are used as fronts for this part of the scheme. The cleverness and sophistication of the scheme is reflected also in that even some victims were manipulated into serving as money mules, unwittingly distributing other victims' funds at the direction of the fictitious love interest. This particular scheme undoubtedly involves many people working in an organized fashion, with varying degrees of knowledge. It is both hierarchical and siloed, sharing characteristics of a narcotics conspiracy with respect to the laundering of the funds, but engrafted onto a confidence game as the primary source of revenue to the criminal organization.

## II. GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); s*ee also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the [18 U.S.C.] § 3553(a) factors" in determining the appropriate sentence. *Id.* at 49–50; *see also Clark*, 434 F.3d at 685.

### A. The Base Offense Level and Loss Amount

The base offense and loss enhancement is not in contention. As agreed in the plea agreement, the base offense level is 7, and the total loss amount was over $1.5 million. Indeed, the government's analysis of relevant bank records and the cellular devices of the defendant shows the intended loss attributable to victims associated with Mbimadong was at least $2 million. As such, a 16-level enhancement for the loss amount is proper under U.S.S.G. § 2B1.1(b)(1)(I).

## B. Ten or More Victims and Substantial Financial Hardship

This enhancement is not in dispute. The Probation Officer is correct that the defendant's offense involved ten or more victims, and substantial financial harm to at least one victim. The Annandale victim has incurred substantial debt and a change of lifestyle. Another 78-year-old victim had to return to the workforce. Savings and retirement accounts have been depleted. Accordingly, the Probation Officer has appropriately applied the parties' stipulated two-level enhancement under § 2B1.1(b)(2)(A). PSR ¶¶ 36, 43.

## C. Sophisticated Means and Overseas Execution of Scheme

Again, the parties have agreed, and the Probation Officer has concurred, correctly, that there is a two-level enhancement for sophisticated means and because a substantial part of the scheme occurred overseas. PSR ¶ 44. This scheme certainly operated with the type of multilayered sophistication that the Fourth Circuit has found to satisfy the sophistication enhancement. *See United States v. Davis*, No. 18-4080, 2018 WL 5096070, at *1 (4th Cir. Oct. 18, 2018) (unpublished) (affirming application of the sophisticated means enhancement where the defendant created a "multilayered scheme" and "used numerous means to conceal the fraud, including forgery, altering documentation, transferring money between accounts, and omitting property from certain accountings"). "The enhancement requires some means of execution that separates the offense from the ordinary or generic." *United States v. Jinwright*, 683 F.3d. 471, 486 (4th Cir. 2012) (tax case). "On the other hand, a defendant need not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *Id*. (internal citations omitted). Multiple false identities were used in execution of the scheme, with the primary orchestrators located in Ghana and communicating with victims in the United States over social media. Multiple shell entities and associated bank accounts were used in furtherance of scheme. For instance, some

victims who attempted due diligence to verify the stories they were being told found websites and online biographies of the supposed lawyers, accountants, and businesspeople that the scammers had inserted into the scheme to render it more plausible. Fake online banks were also used to trick victims into believing that they would be repaid for monies loaned to the love interest, once the love interest was out of trouble. As for the defendant, she knew the contours of the scheme and its origins overseas, so much of this was foreseeable to her.

### D. Vulnerable Victims

The Sentencing Guidelines allow for a two-level adjustment "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A vulnerable victim is a person "(A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable ... and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2.

For the vulnerable victim enhancement to apply, the record must show that: 1) the victim of the offense was unusually vulnerable; and 2) the defendant knew or should have known of the victim's unusual vulnerability. *United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010). The enhancement thus "requires a fact-based explanation of why advanced age or some other characteristic made one or more victims unusually vulnerable to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." *Id*.

In *United States v. Shephard*, 892 F.3d 666 (4th Cir. 2018), the Fourth Circuit held that victim "reloading" may support the application of the vulnerable victim enhancement. As the Shepard Court noted, the practice of "reloading" involves targeting people who have already fallen

7

victim to the scheme at least once, if not repeatedly. *Id*. at 670. The Fourth Circuit explained that a victim's decision to wire money in response to the initial fraudulent phone call is evidence that they are "particularly susceptible to the criminal conduct." *Id*. at 671. That is why fraudsters thereafter repeatedly target that victim.

In reaching this holding, the Fourth Circuit joined many sister circuits that have approved the use of "reloading" to support the vulnerable victim enhancement. *See United States v. Lloyd*, 807 F.3d 1128, 1172–73 (9th Cir. 2015); *United States v. Hoffecker*, 530 F.3d 137, 201–02 (3d Cir. 2008); *United States v. Day*, 405 F.3d 1293, 1295–96 (11th Cir. 2005); *United States v. Coe*, 220 F.3d 573, 582 (7th Cir. 2000); *United States v. Brawner*, 173 F.3d 966, 972–73 (6th Cir. 1999); *United States v. O'Neil*, 118 F.3d 65, 75–76 (2d Cir. 1997).

Victim "reloading," as understood by these courts, does not require a specific minimum number of revictimizations. Rather, simply retargeting prior victims for even more fraud is sufficient. Citing to language from the Seventh Circuit's opinion in *United States v. Jackson*, 95 F.3d 500, 508 (7th Cir. 1996), the Fourth Circuit explained:

> Whether these persons are described as gullible, overly trusting, or just naive (and whatever the cause of this condition), ... their readiness to fall for the telemarketing rip-off, not once but twice (and in [one] case, four times), demonstrated that their personalities made them vulnerable in a way and to a degree not typical of the general population.... The structuring of the reloading process, the designating of customers as "reloads," ... the charging of higher sums to reloads, and the systematic re-victimizing of people ... amply demonstrate that the defendants believed the reloaded persons to be especially vulnerable and that they specifically targeted them because of this vulnerability.

*Shepard*, 892 F.3d at 671 (emphasis in original). *See also Lloyd*, 807 F.3d at 1173 (being victimized "not once but twice" demonstrated that their personalities made them vulnerable in a way and to a degree not typical of the general population); *Day*, 405 F.3d at 1296 ("reloaded"

8

victims contacted "not once but twice"); *O'Neil*, 118 F.3d at 75–76 ("reloaded" victims contacted up to two more times).

Here, the 78-year-old Annandale victim was repeatedly victimized and re-victimized. The 74-year-old Colorado victim had also previously been victimized in smaller quantities, before she mailed the $79,300 cashier's check to the defendant. A 58-year-old female victim in Texas was repeatedly defrauded, losing a total of $295,000, and in the process not only depleted her retirement savings, but also incurred a $36,000 tax bill for early withdrawal penalties. She is not alone in that aspect of the victimization: serious collateral consequences have followed for these victims. Regardless of age, the psychological vulnerability that the scammers identified in the victims they repeatedly preyed upon is the type of vulnerability that the courts in the cases discussed above have considered sufficient to earn this Chapter 3 adjustment.

Victims identified to date in this case range from 54 years old to 78 years of age, many recently widowed or divorced, who were looking for companionship or new starts in lives. Several victims are elderly. Courts frequently have found elderly individuals to be unusually vulnerable to telemarketing fraud schemes similar to the romance fraud scheme at issue here. *See, e.g., O'Neil,* 118 F.3d at 75*; United States v. Cron,* 71 F.3d 312, 314 (8th Cir.1995); *United States v. Leonard,* 61 F.3d 1181, 1188 (5th Cir.1995). Almost by definition, a romance scheme such as this cannot work without preying on vulnerable people, some of whom are elderly, and many more of whom were isolated at home or otherwise starved for companionship. The defendant here understood the overall contour of this scheme. That people like the Colorado victim and the Annandale victim, both of whom she has never met before, would send large checks to her and to Broni sight unseen, is enough to indicate the likelihood of some degree of vulnerability to the defendant. Accordingly, the two-level enhancement correctly applies here.

### E. The Defendant's Role in the Offense

The Probation Officer is correct that defendant Mbimadong played a supervisory role in the scheme with respect to lower-level money mules and the co-defendant, who often acted at her direction. Accordingly, a two-level adjustment is applicable to her under §3B1.2. PSR ¶ 46. In applying this enhancement, among the factors a sentencing court should consider are: the degree to which the defendant understood the scope and structure of the criminal activity; the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and the degree to which the defendant stood to benefit from the criminal activity. § 3B1.1 note 4.

First, the crimes at issue in this case involved many participants. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." § 3B1.1 note 1. Second, the conspiracy was also "otherwise extensive." The application note explains:

> In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

§ 3B1.1 note 3. Third, the defendant managed or supervised portions of the conspiracy, specifically other money mules. She also coordinated with others to transport goods purchased with victim funds to Ghana, either by shipping the items or arranging for associates to transport them on international flights.

Fourth, FBI's financial analysis has shown that the defendant kept approximately 10% of the victim funds laundered through her accounts and approximately 5% of victim funds routed through bank accounts within the sub-network of money mules operating at her direction. That accounts for the amount of forfeiture in this case – approximately $200,000, which represents the defendant's gain from the scheme and is certainly financial incentive enough for her to participate in it with full knowledge and intent.

### F. Acceptance of Responsibility

The United States concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and, in accordance with the plea agreement, hereby moves for the additional one-point reduction under U.S.S.G. § 3E1.1(b).

### III. IMPOSITION OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

Likewise, "[t]he fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *United States v. Langford*, 516 F.3d 205, 211-12 (3d Cir. 2008) (quotation omitted). Moreover, "the authors of the Guidelines, no less than district courts, have been tasked with ensuring that criminal sentences meet the goals of sentencing set forth in § 3553(a)," *United States v. Merced*, 603 F.3d 203, 221-22 (3d Cir. 2010), and have prepared "Guidelines that seek to embody the § 3553(a) considerations," *Rita,* 551 U.S. at 347-50. 28 U.S.C. §§ 991(b)(1)(A), 994(f). In general, then, "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range[.]" *Goff*, 501 F.3d at 257 (quotation omitted).

Based on all these factors, including the government's sealed filing, a significant sentence of imprisonment, but one below the advisory guideline range, is appropriate in this case.

### A. The Nature, Circumstances, and Seriousness of the Offense

This offense devastated the lives of many victims. In the words of a 58-year-old Texas woman, in relevant part:

> The impact of this has taken a huge toll on my financial, mental, physical and spiritual well being. I trusted this "person" and was promised a future of financial security as well as a loving relationship. My financial future has been destroyed.
>
> In total, I have sent over $295,000. As a result, I am left with credit card and personal loan debt. I withdrew over approximately $225,000 from my 401K.
>
> The amount of shame and devastation this ordeal has brought to my life is overwhelming. I am on the brink of financial collapse as well as emotional collapse. I beat myself everyday for falling victim to this predator. I am a highly intelligent human being who opened up her heart to meet someone decent and kind, instead I was demoralized and taken advantage of. My life is ruined financially and my ability to trust is destroyed. My hopes and dreams to retire in approximately 6 years is now gone. The amount of fear and hopelessness has

consumed me. I truly fear that I may not recover.

Victim Impact Statement of Individual A.P.

Sadly, this Texas victim is not alone. The extent of the psychological manipulation and abuse of victims is stunning. When flattery and promises of love and riches would no longer work, or when victims were tapped out financially, the scammers directed victims to borrow from friends or to sell their only vehicles and send the proceeds to people like the defendant and Broni. The scammers would even threaten the victims or create extortionate scenarios requiring money to save the life of the fictious love interest overseas.

These defendants, Mbimadong and Broni, benefitted financially from the abuse of the vulnerable victims in this case. Mbimadong and Broni took their approximate 10% cuts (or approximate 5% if the money was routed through a lower-level mule) of the scam proceeds. They formed an essential link in the scheme and knew the monies were the proceeds of a romance scam. Moreover, Mbimadong engaged in other smaller crimes to help execute this scheme. For these reasons, the particularly terrible nature of this type of financial crime should not be underestimated. Indeed, according to the Federal Trade Commission, which tracks data on reported scams, "imposter scams" (which include romance fraud schemes) cost American consumers approximately $1.2 billion in losses in 2020 alone.[1] These scammers are cold-hearted predators who are profitable and successful in evading detection by banks and law enforcement in large part because of assistance from people like the defendant.

---

[1] https://www.ftc.gov/news-events/press-releases/2021/02/new-data-shows-ftc-received-2-2-million-fraud-reports-consumers (last visited Dec. 21, 2021).

B.  **The Defendant's History and Characteristics and the Need for Specific Deterrence**

The history and characteristics of the defendant support a meaningful carceral sentence. Although the defendant has no scored criminal history, the sheer number of uncharged crimes she has committed in connection to this case is staggering. It is certainly encouraging that she has expressed remorse and wants to change her ways, but it is also important that she serve a significant jail sentence for his actions in this matter.

C.  **Need to Deter Future Criminal Conduct and Promote Respect for the Law**

A significant, but not excessive sentence, is also called for in this case to promote general deterrence. Absent a meaningful term of imprisonment, general deterrence — "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized.").

Absent a term of imprisonment to punish participation in the scourge of these types of schemes, general deterrence— "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow" —will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). A significant sentence is necessary to send the appropriate message to these defendants--

and importantly, to their confederates who are closely watching, or those they might seek to recruit --that those who engage in this conduct will be caught and punished significantly.

  D.  **Avoid Unwarranted Sentencing Disparities**

The defendants, Mbimadong and Broni, are the first two defendants to be charged in this case. Accordingly, there is no other similarly situated defendant in this case whose sentence could or should serve as a reference point. Indeed, a sentence pegged to the guidelines is less likely to create future sentencing disparities. That is because, as the Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was appropriate, and was not a disparity, but a justifiable difference); *see also United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012) (*quoting United States v. Smith*, 510 F.3d 603, 610 (6th Cir.2010)) ("To find an unwarranted disparity in this case would allow defendants to bind district courts according to the most lenient sentence that another court had imposed for a similar crime.")."

## IV. CONCLUSION

Based on the 18 U.S.C. § 3553(a) factors, a meaningful custodial sentence, as well as orders of restitution and forfeiture,[2] and a three-year term of supervised release, are appropriate in this case.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: /s/ Russell L. Carlberg

Russell L. Carlberg
Assistant United States Attorney
Amelia R. Medina
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3947
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov

---

[2] The defendant agreed to forfeiture and restitution as part of her plea agreement. Moreover, forfeiture and restitution are both mandatory in this case. The United States intends to present to the Court consent orders of restitution and forfeiture in advance of the sentencing hearing, assuming the parties can reach agreement. The United States will ask that the Court enter those orders as part of its judgment at sentencing.

# CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2021, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

A copy has also been sent via email to:

Jennifer D. Lyerly
United States Probation Officer
jennifer_lyerly@vaep.uscourts.gov

/s/
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3947
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov